1   TONY WEST
    Assistant Attorney General
2   R. MICHAEL UNDERHILL
    Attorney in Charge, West Coast and Pacific Rim Office
3   ERIC KAUFMAN-COHEN, Trial Attorney
    Torts Branch, Civil Division
4   U.S. Department of Justice
    7-5395 Federal Bldg., Box 36028
5   450 Golden Gate Avenue
    San Francisco, California  94102-3463
6   Telephone: (415) 436-6648; Facsimile: (415) 436-6632
    mike.underhill@usdoj.gov; eric.kaufman-cohen@usdoj.gov
7
    JOHN C. CRUDEN
8   Acting Assistant Attorney General
    Environment and Natural Resources Division
9   United States Department of Justice
    Washington D.C. 20530
10  BRADLEY R. O'BRIEN, Senior Attorney
    ANN HURLEY, Trial Attorney
11  Environmental Enforcement Section
    United States Department of Justice
12  301 Howard Street, Suite 1050
    San Francisco, California 94105
13  Telephone: (415) 744-6484; Facsimile: (415) 744-6476
    brad.o'brien@usdoj.gov; ann.hurley@usdoj.gov
14
    Attorneys for Plaintiff United States of America
15
                    UNITED STATES DISTRICT COURT
16
                   NORTHERN DISTRICT OF CALIFORNIA
17

18  UNITED STATES OF AMERICA,          )  Civil No. C07-6045 SC
                                       )  (AND RELATED CASES)
                  Plaintiff,           )
19                                     )
                                       )  IN ADMIRALTY
20                v.                   )
                                       )  MOTION AND MEMORANDUM OF
21  M/V COSCO BUSAN, LR/IMO Ship No. 9231743,)  THE UNITED STATES FOR PARTIAL
    her engines, apparel, electronics, tackle, boats,)  SUMMARY JUDGMENT AGAINST
22  appurtenances, etc., in rem, REGAL STONE)  DEFENDANTS REGAL STONE LIMITED,
    LIMITED, FLEET MANAGEMENT LTD., and)  FLEET MANAGEMENT LIMITED, AND
23  JOHN COTA, in personam,            )  JOHN COTA, IN PERSONAM, AND M/V
                                       )  COSCO BUSAN, IN REM, REGARDING
                  Defendants.          )  PROOF OF PRIMA FACIE ELEMENTS OF
24                                     )  LIABILITY, STATUTORY DEFENSES,
                                       )  AND LIMITS OF LIABILITY
25                                     )
                                       )
26  _____)  Date: December 18, 2009
                                          Time: 10:00 a.m.
27                                        Courtroom: Honorable Samuel Conti

28

**INDEX**

MOTION ................................................................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ...................................... 2, *passim*

FACTUAL BACKGROUND RELEVANT TO THE MOTION .............................. 2

DISCUSSION ........................................................................................................ 3

I.      THE LEGAL STANDARDS APPLICABLE TO SUMMARY JUDGMENT ................... 3

II.     THE UNITED STATES IS ENTITLED TO SUMMARY JUDGMENT AS
        A MATTER OF LAW REGARDING PROOF OF THE ELEMENTS OF
        STRICT LIABILITY UNDER OPA, THE NMSA, AND THE PSRPA ............................ 4

        A.      Liability Under OPA, NMSA, and PSRPA Is Strict Liability ................................... 4

                1.      OPA Strict Liability ................................................................ 4

                2.      The National Marine Sanctuaries Act ............................................ 5

                3.      The Park System Resource Protection Act ..................................... 6

        B.      The *Prima Facie* Elements of Strict Liability Under OPA, the NMSA, and the
                PSRPA Have Been Satisfied ................................................................. 7

                1.      OPA Strict Liability Elements ....................................................... 7

                2.      NMSA Strict Liability Elements ................................................. 10

                3.      PSRPA Strict Liability Elements ................................................ 16

III.    DEFENDANTS CANNOT SUSTAIN THEIR BURDEN OF PROVING
        THE STATUTORY DEFENSES TO STRICT LIABILITY UNDER OPA,
        THE NMSA, AND THE PSRPA ....................................................................... 18

        A.      Defenses to OPA Strict Liability ............................................................. 19

        B.      Defenses to NMSA and PSRPA Strict Liability ...................................... 21

IV.     THE DEFENDANTS' STRICT LIABILITY UNDER OPA, THE NMSA,
        AND THE PSRPA IS NOT LIMITED BY ANY MONETARY CAP ............................ 21

CONCLUSION ..................................................................................................... 24

1

## TABLE OF AUTHORITIES

2

### FEDERAL CASES

3

*"Agent Orange" Product Liability Litigation*,
   611 F. Supp. 1223 (E.D.N.Y. 1985), *aff'd*,

4

   818 F.2d 187 (2d Cir. 1987) ............................................................. 3

5

*Alaska Sport Fishing Association v. Exxon Corporation*,
   34 F.3d 769 (9th Cir. 1994) ............................................................ 14

6

7

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242, 106 S.Ct. 2505, 91 L. Ed. 2d 202 (1986) ................................ 3

8

*Ardestani v. I.N.S.*,
   502 U.S. 129, 112 S.Ct. 515, 116 L. Ed. 2d 496  (1991) ............................... 10

9

*Burgess v. M/V TAMANO*,
   564 F.2d 964 (1st Cir. 1977), *cert. denied*,

10

   435 U.S. 941 (1978) ................................................................... 19

11

*Celotex Corp. v. Catrett*,

12

   477 U.S. 317, 106 S.Ct. 2548, 91 L. Ed. 2d 265 (1986) ............................... 3

13

*Complaint of Metlife Capital Corp.*,
   132 F.3d 818 (1st Cir. 1997) ........................................................... 4

14

*Cox v. Kentucky Department of Transport*,

15

   53 F.3d 146 (6th Cir.1995) ............................................................. 4

16

*Home Depot U.S.A. Inc. v. United States Fidelity and Guaranty Company*,
   2009 WL 981321 (N.D. Cal., April 13, 2009) ........................................... 3

17

*Lombardi v. Dow Chemical Co.*,

18

   487 U.S. 1234, 108 S.Ct. 2898 (1988) ................................................. 3

19

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
   475 U.S. 574, 106 S.Ct. 1348 (1986) .................................................. 3

20

*Mills Music, Inc. v. Snyder*,

21

   469 U.S. 153, 105 S.Ct. 638, 83 L. Ed. 2d 556 (1985) ................................. 11

22

*Mintz v. Mathers Fund, Inc.*,
   463 F.2d 495 (7th Cir. 1972) .......................................................... 3

23

*Monell v. Department of Social Serv. of City of New York*,

24

   436 U.S. 658, 98 S.Ct. 2018, 56 L. Ed. 2d 611 (1978) ................................. 11

25

*Needham, et al. v. Hamilton*,
   354 F.3d 340 (5th Cir. 2003) .......................................................... 4

26

27

28

*Nunez v. Superior Oil Co.*,
572 F.2d 1119 (5th Cir. 1978) ................................................................. 4

*Reliance Insurance Co. v. United States*,
677 F.2d 844 (Ct. Cl. 1982) ................................................................. 5

*Sabine Towing & Transport Co., Inc. v. United States*,
666 F.2d 561 (Ct. Cl. 1981) ................................................................. 5

*Transworld Airlines, Inc. v. American Coupon Exchange, Inc.*,
913 F.2d 676 (9th Cir. 1990) ................................................................. 4

*Tug Allie-B, Inc. v. United States*,
273 F.3d 936 (11th Cir. 2001) ................................................... 6, *passim*

*United States v. Bly*,
510 F.3d 453 (4th Cir. 2007) ........................................................ 11, 16

*United States v. COSCO BUSAN, et al.*,
557 F. Supp.2d 1058, 2008 A.M.C. 1360 (N.D. Cal. 2008) ................. 2, 4, 17

*United States v. Fisher*,
977 F. Supp. 1193 (S.D. Fla. 1997) ......................................................... 5

*United States v. Great Lakes Dredge and Dock Co.*,
259 F.3d 1300 (11thCir. 2001), *cert. denied*,
535 U.S. 955 (2002) ................................................................. 5, *passim*

*United States v. LeBeouf Brothers Towing.*,
621 F.2d 787 (5th Cir. 1980), *reh'g denied*,
629 F.2d 1350 (1980), *cert. den.*,
452 U.S. 906, 101 S.Ct. 3031 (1981) ......................................................... 5

*United States v. M/V Jacqueline L.*,
100 F.3d 1520 (11th Cir. 1996) ................................................................. 5

*United States v. M/V Miss Beholden*,
856 F. Supp. 668 (S.D. Fla. 1994) .................................................... 5, 11

*United States v. Miguel*,
111 F.3d 666 (9th Cir. 1997) ................................................................. 11

*United Steelworkers of America v. Phelps Dodge Corp.*,
865 F.2d 1539 (9th Cir. 1989), *cert. denied*,
493 U.S. 809 (1989) ................................................................. 3

*Unocal Corporation v. Metrolink*,
222 F.3d 528 (9th Cir. 2000) ........................................................ 4, 18

# FEDERAL STATUTES

Dictionary Act,

    1 U.S.C. § 1 ........................................................................................ 11, 16

Endangered Species Act,

    16 U.S.C. § 1531, *et seq* ............................................................................ 15

    16 U.S.C. § 1540 ..................................................................................... 15

Federal Water Pollution Control Act/Clean Water Act,

    33 U.S.C. § 1319(c)(1)(A) ....................................................................... 12

    33 U.S.C. § 1321 ................................................................................... 4, 5

    33 U.S.C. § 1321(b)(7) .............................................................................. 1

Inland Rules of the Road

    33 U.S.C. §§ 2001, 2002, 2005, 2006, 2007, 2008 ........................................ 23

Migratory Bird Treaty Act,

    16 U.S.C. § 703 ................................................................................. 12, 15

National Marine Sanctuaries Act,

    16 U.S.C. §§ 1431, *et seq* ............................................................... 1, *passim*

    16 U.S.C. § 1432(6) ............................................................................... 13

    16 U.S.C. § 1437(e)(1) .............................................................................. 1

    16 U.S.C. § 1443(a)(3) ............................................................................ 18

    16 U.S.C. § 1443(a)(3) ............................................................................ 20

    16 U.S.C. § 1443(a)(3)(C) ....................................................................... 21

    16 U.S.C. § 1443(a)(4) ............................................................................ 21

    16 U.S.C. § 1432(6)(II) ........................................................................... 14

    16 U.S.C. § 1443 ..................................................................................... 5

    16 U.S.C. § 1443(a)(1) ............................................................................ 10

    16 U.S.C. § 1443(a)(2) ............................................................................ 10

Oil Pollution Act of 1990,

    33 U.S.C. §§ 2701, *et seq* ........................................................................... 1, *passim*

    33 U.S.C. § 2701(11) ................................................................................................ 20

    33 U.S.C. § 2701(20) .................................................................................................. 4

    33 U.S.C. § 2701(32) .................................................................................................. 4

    33 U.S.C. § 2702 ........................................................................................................ 4

    33 U.S.C. § 2702(a) .................................................................................................... 7

    33 U.S.C. § 2702(2)(A) ............................................................................................ 14

    33 U.S.C. § 2702(a) .................................................................................................... 4

    33 U.S.C. § 2703(a)(3) .............................................................................................. 19

    33 U.S.C. § 2703(a) ........................................................................................ 18, 19, 24

    33 U.S.C. § 2703(b) ........................................................................................... 20, 24

    33 U.S.C. § 2704(a) .................................................................................................. 22

    33 U.S.C. § 2704(c) .................................................................................................. 22

Park Service Protection and Restoration Act,

    16 U.S.C. §§ 19jj, *et seq* .......................................................................... 1, *passim*

    16 U.S.C. §19jj-1(a) ................................................................................................ 16

    16 U.S.C. § 19jj-1(b) ............................................................................................... 16

    16 U.S.C. § 19jj-1(c) .......................................................................................... 18,20

    16 U.S.C. § 19jj-1(c)(3) ........................................................................................... 21

46 U.S.C. § 30505 ............................................................................................................ 21

## FEDERAL REGULATIONS

National Marine Sanctuaries Act Regulations,

    15 C.F.R. § 922.130 ................................................................................................. 12

    15 C.F.R. § 922.3 ............................................................................................... 11, 13

    15 C.F.R. § 922.80 ................................................................................................... 12

15 C.F.R. § 990.30 ........................................................................................ 14

Navigation Safety Regulations,

33 C.F.R. § 164, *et seq.*. ............................................................................... 22

33 C.F.R. § 164.01 ........................................................................................ 22

33 C.F.R. § 164.11 ................................................................................... 22, 23


# FEDERAL RULES OF CIVIL PROCEDURE

Fed.R.Civ.P. 50(a) ........................................................................................... 3

Fed.R.Civ.P. 56 ........................................................................................... 1, 3


# STATE STATUTES

Cal.Fish & G.Code §§ 2050, *et seq.* ............................................................. 15

Cal.Fish & G.Code § 120008 ......................................................................... 15

**MOTION**

Pursuant to Rule 56(a) of the Fed.R.Civ.P., the United States moves for partial summary judgment against Defendants Regal Stone Limited ("Regal Stone"), Fleet Management Limited ("Fleet"), and John Cota ("Cota"), *in personam*, and M/V COSCO BUSAN, *in rem*.  The motion seeks the following:

o    A declaration that the *prima facie* elements of liability for response costs and damages, including natural resource damages, have been established under the following three strict liability statutory causes of action asserted by the United States: (a) the Oil Pollution Act ("OPA"), 33 U.S.C. §§ 2701, *et seq.* (as against Regal Stone and Fleet); (b) the National Marine Sanctuaries Act ("NMSA"), 16 U.S.C. §§ 1431, *et seq.* (as against Fleet, Cota, and COSCO BUSAN); and (c) the Park System Resource Protection Act ("PSRPA"), 16 U.S.C. §§ 19jj, *et seq.* (as against Fleet, Cota, and COSCO BUSAN);[1]/

o    With one exception specified and discussed below concerning OPA, a declaration that none of the statutory defenses to liability under any of the three strict liability statutes are available to the defendants; and

o    A declaration that the defendants' liability to the United States under the foregoing statutory causes of action is unlimited by any monetary cap.

The United States' motion is based upon this motion and memorandum, the declarations filed herewith, admissions of various parties/defendants as contained in official court files and docket entries in cases in this District, including *United States  v. Fleet Management Limited, John Cota*, No. 08-CR-00160 SI (the "Criminal Case"), the official court files in this and the various related cases, and the proposed Order filed with this motion.

//

//

//

---

[1]    The motion seeks adjudication of liability issues only.  Conversely, the motion does *not* seek adjudication of the *amount* of damages owing under the three statutes, the amount of damages being reserved for further proceedings.  The Government's First Amended Complaint also seeks a judicially assessed civil penalty under the Clean Water Act ("CWA"), 33 U.S.C. § 1321(b)(7), as amended by OPA, and also *in rem* forfeiture pursuant to provisions of the NMSA, 16 U.S.C. § 1437(e)(1).  This motion does *not* seek summary judgment on the penalty and forfeiture causes of action. Those issues are reserved for subsequent settlement, motion, or, if necessary, trial.

## MEMORANDUM OF POINTS AND AUTHORITIES
## FACTUAL BACKGROUND RELEVANT TO THE MOTION

For purposes of this motion, the relevant facts are few and undisputed.  On the morning of November 7, 2007, the Hong-Kong flagged M/V COSCO BUSAN set out from Oakland for intended passage to the Far East.  At approximately 8:30 a.m., the ship allided with the Bay Bridge and thereafter discharged approximately 53,000 gallons of fuel oil into San Francisco Bay and the Pacific Ocean, including waters and shorelines comprising parts of the Gulf of the Farallones National Marine Sanctuary, the Monterey Bay National Marine Sanctuary, the Golden Gate National Recreation Area, the Point Reyes National Seashore, and the San Francisco Maritime National Historic Park.

At all relevant times, COSCO BUSAN was owned by Regal Stone and operated by Fleet.  Cota was a member of the San Francisco Bar Pilot's Association and at all relevant times was the ship's pilot.  The United States filed this action against COSCO BUSAN, *in rem*, and Regal Stone, Fleet, and Cota, *in personam,* all of whom have appeared and are subject to the Court's jurisdiction.  Relevant to this motion, the United States' First Amended Complaint states three independent statutory bases of liability for pollution response costs and damages, including damages for injuries to natural resources: (1) OPA, 33 U.S.C. §§ 2701, *et seq.* (against Regal Stone and Fleet); (2) the NMSA, 16 U.S.C. §§ 1431, *et seq.* (against Regal Stone, Fleet, Cota, and COSCO BUSAN); and (3) the PSRPA, 16 U.S.C. §§ 19jj, *et seq.* (against Regal Stone, Fleet, Cota, and COSCO BUSAN).

Defendants Regal Stone and Fleet previously filed a motion to dismiss the Government's Amended Complaint.  The Court denied the motion pursuant to its Order of May 9, 2008.  *United States v. COSCO BUSAN, et al.*, 557 F.Supp.2d 1058, 2008 A.M.C. 1360 (N.D. Cal. 2008) (hereafter "*United States v. COSCO BUSAN*").  Since that time, both Regal Stone and Fleet have filed various pleadings and papers in the related civil cases before this Court.  Likewise, Fleet and Cota have pled to certain criminal counts filed against them in the Criminal Case.  Admissions made by defendants in the civil pleadings and by Fleet and Cota in their respective criminal pleas establish the basis for entry of partial summary judgment as a matter of law.

//
//
//
//

**DISCUSSION**

**I.**   **THE LEGAL STANDARDS APPLICABLE TO SUMMARY JUDGMENT**

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Rule 56(c), Fed.R.Civ.P.  As this Court recently summarized in *Home Depot U.S.A. Inc. v. United States Fidelity and Guaranty Company*, 2009 WL 981321 (N.D. Cal., April 13, 2009):

> 'Summary judgment should be granted where the evidence is such that it would require a directed verdict for the moving party.' *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, 'Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In addition, entry of summary judgment in a party's favor is appropriate when there are no material issues of fact as to the essential elements of the party's claim. *Anderson,* 477 U.S. at 247-49.

The non-movant must do more than simply show that there is some metaphysical doubt as to the material facts.  *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986).  As summarized by the Ninth Circuit, a "scintilla of evidence", or evidence that is merely "colorable or not significantly probative" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989), *cert. denied*, 493 U.S. 809 (1989) (citation omitted).

Furthermore, since summary judgment is a procedural device which is used to avoid a useless trial and for promptly disposing of actions where there is no genuine issue of material fact involved, *Mintz v. Mathers Fund, Inc*., 463 F.2d 495, 498 (7th Cir. 1972), the object of such a motion is to separate what is formal or pretended in denial or averment from what is genuine and substantial, so that only the latter may subject a suitor to the burden of trial.  *"Agent Orange" Product Liability Litigation*, 611 F.Supp. 1223, 1257 (E.D.N.Y. 1985), *aff'd*, 818 F.2d 187 (2d Cir. 1987), *cert. den'd*, *Lombardi v. Dow Chemical Co.*, 487 U.S. 1234, 108 S.Ct. 2898 (1988).

As to the role to be played by court and jury, it is axiomatic that the standard for summary judgment in jury actions mirrors the standard for a directed verdict under Fed.R.Civ.P. 50(a), *see*, *Anderson*, *supra*, 477 U.S. at 250, 106 S.Ct. at 2511, but the standard necessarily must be viewed differently where the court itself is the fact finder.  As stated by the Fifth Circuit:

> If decision is to be reached by the court, and there are no issues of witness credibility, the court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact, even though [the] decision may depend on inferences to be drawn from what has been incontrovertibly proved. Under those circumstances ... the judge who is also the trier of fact may be warranted

> in concluding that there was or was not negligence, or that someone acted reasonably or unreasonably ... even if that conclusion is deemed 'factual' or involves a 'mixed question of fact and law.'... A trial on the merits would reveal no additional data.... The judge, as trier of fact, is in a position to and ought to draw his inferences without resort to the expense of trial.

*Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1124-1125 (5th Cir. 1978).  Accord, *Transworld Airlines, Inc. v. American Coupon Exchange, Inc.,* 913 F.2d 676, 684 (9th Cir. 1990).  "[I]n the 'new era' of summary judgments that has evolved from the teachings of the Supreme Court in *Anderson, Celotex* and *Matsushita*, trial courts have been afforded considerably more discretion in evaluating the weight of the nonmoving party's evidence."  *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir.1995).  "If the record taken in its entirety could not convince a rational trier of fact to return a verdict in favor of the nonmoving party, the motion must be granted."  *Id.*

## II.  THE UNITED STATES IS ENTITLED TO SUMMARY JUDGMENT AS A MATTER OF LAW REGARDING PROOF OF THE ELEMENTS OF STRICT LIABILITY UNDER OPA, THE NMSA, AND THE PSRPA

### A.  Liability Under OPA, NMSA, and PSRPA Is Strict Liability

#### 1.  OPA Strict Liability

In the wake of the EXXON VALDEZ oil spill, Congress passed the Oil Pollution Act of 1990, 33 U.S.C. §§ 2701, *et seq*.  OPA imposes strict liability for pollution removal costs and damages on the "responsible party" for a vessel or a facility from which oil is discharged.  33 U.S.C. § 2702(a); *Unocal Corporation v. Metrolink*, 222 F.3d 528, 534 (9th Cir. 2000); *Complaint of Metlife Capital Corp.*, 132 F.3d 818, 820-21 (1st Cir. 1997); *Needham, et al. v. Hamilton*, 354 F.3d 340, 344 (5th Cir. 2003).  "Responsible parties" include owners, operators, or demise charterers of a vessel.  OPA, 33 U.S.C. § 2701(32); *Complaint of Metlife*, *supra,* 132 F.3d at 821; *United States v. COSCO BUSAN, supra*, 557 F.Supp.2d at 1061.

Relevant here, the United States has asserted claims under OPA, 33 U.S.C. § 2702, for pollution removal costs and Natural Resource Damages.[2]/  Congress expressly looked to OPA's predecessor statute, the Federal Water Pollution Control Act ("FWPCA", also referred to as the Clean Water Act or "CWA") as the basic framework for OPA:

> The body of law already established under section 311 of the Clean Water Act [33 U.S.C. § 1321] is the foundation of the reported bill. . .

---

[2]    "Natural Resources" and "removal costs" are broadly defined in OPA at 33 U.S.C. § 2701(20) and (31), respectively.

*          *          *          *          *          *

[OPA] continues to rely on [FWPCA, 33 U.S.C. § 1321] as the basic law providing for cleanup authority . . . and, by adopting the standard of liability under [33 U.S.C. § 1321] as the standard of liability under this Act, for liability of dischargers for cleanup costs for the discharge of oil. That standard of liability has been determined repeatedly to be strict, joint, and several liability. This bill adopts these standards for economic liability, as well as for removal costs and natural resource damages.

Senate Rep. No. 101-94, 1990 U.S. Code Cong. & Admin. News at 726, 732-33. This standard of liability was made clear in OPA's definition section, which defines the terms "liable" or "liability" to mean "the standard of liability which obtains under [FWPCA/CWA, 33 U.S.C.] section 1321 of this title". OPA, 33 U.S.C. § 2701(17). In turn, FWPCA/CWA case law unequivocally held that the standard of statutory liability was strict liability. *Reliance Insurance Co. v. United States*, 677 F.2d 844, 848 (Ct. Cl. 1982) (the absence of fault, or the exercise of due care, is not a defense to statutory strict liability); *Sabine Towing & Transp. Co., Inc. v. United States*, 666 F.2d 561, 563 (Ct. Cl. 1981) (same); *United States v. LeBeouf Bros. Towing.*, 621 F.2d 787, 789 (5th Cir. 1980), *reh'g denied*, 629 F.2d 1350 (1980), *cert. den.*, 452 U.S. 906, 101 S. Ct. 3031 (1981) (same).

## 2.    The National Marine Sanctuaries Act

The NMSA governs the designation and management of federally protected marine areas of specific interest. Congress enacted the NMSA in response to the increasing degradation of marine habitats and in recognition of the need to protect marine ecosystems. *United States v. Great Lakes Dredge and Dock Co.*, 259 F.3d 1300, 1304 (11th Cir. 2001), *cert. denied*, 535 U.S. 955 (2002). The purpose of the NMSA is to preserve sensitive areas for their conservation, recreational, ecological, or aesthetic value. *United States v. Fisher*, 977 F.Supp 1193, 1999 (S.D. Fla. 1997).

Under the NMSA, any "person" or vessel that "destroys, causes the loss of, or injures any sanctuary resource" is strictly liable for an amount equal to response costs and damages resulting from this injury. 16 U.S.C. § 1443; *Great Lakes Dredge & Dock Co., supra*, 259 F.3d at 1304-05; *United States v. M/V Jacqueline L.*, 100 F.3d 1520, 1521 (11th Cir. 1996); *United States v. M/V Miss Beholden*, 856 F.Supp. 668 (S.D. Fla. 1994).

The legislative history of the NMSA makes it clear that liability under the statute is strict. As stated in the House Report accompanying the 2000 amendments to the NMSA (emphasis added):

The NMSA protects areas designated as National Marine Sanctuaries in several ways. ... *Sanctuaries are covered by strict vessel liability provisions, which apply to oil*

*spills, groundings, or other actions that damage marine sanctuary resources.*[3]/

Indeed, the NMSA was amended in 1988 partly in response to an oil spill that arose in this District and in one of the sanctuaries harmed in this case, the Gulf of the Farallones National Marine Sanctuary, a spill which in turn led to suit before this Court. *See*, S. Rep. 100-595 (1988), as reprinted in 1988 U.S.C.C.A.N. 4387-88 ("In recent years, two accidents have caused significant damage to marine sanctuary resources. [One of] these events involved the ... grounding and rupture of an oil tanker, the M/V Puerto Rican, near the Farallones National Marine Sanctuary...").

### 3.    The Park System Resource Protection Act

The PSRPA was enacted in 1990 by the same Congress that passed OPA.  The PSRPA was put into law to protect and preserve the resources of the National Parks.  As stated by Congress, the purpose of PSRPA was to authorize the United States:

> ... to initiate legal action against individuals who destroy or injure living or non-living marine or ... aquatic resources within units of the National Park System, and to allow the Secretary to use funds recovered as a result of damage to living or non-living resources . . . for restoration of such resources.

Senate Comm. on Energy & Nat. Res., S. Rep. No. 328, 101st Cong., 2d Sess. 1, as reprinted in 1990 U.S. Code Cong. & Admin. News 603 (1990).[4]/

As with OPA and the NMSA, the standard of liability under the PSRPA is strict liability. *Tug Allie-B, Inc. v. United States*, 273 F.3d 936, 942-43, fn.5 (11th Cir. 2001) (comparing the provisions of the PSRPA with the nearly identical strict liability provisions of the NMSA).  Like the NMSA, the PSRPA provides that "any person" or vessel that "destroys, causes the loss of, or injures" any park system resource is liable to the United States for response costs and damages resulting from such destruction, loss or injury."  16 U.S.C. § 19jj-1(a) and (b).

//
//
//
//

---

[3]    H.R. REP. 106-224, accompanying H.R. 1243, 106TH Cong., 1st Sess. 1999, 1999 WL 493119 * 1 (Leg.Hist.).  *See*, Pub.L. 106-513, November 13, 2000, 114 Stat. 2389.

[4]    The PSRPA was amended in 1996 to extend its scope to all resources within any unit of the National Park System.

**B.    The *Prima Facie* Elements of Strict Liability Under OPA, the NMSA, and the PSRPA Have Been Satisfied**

      **1.    OPA Strict Liability Elements**

For purposes of this vessel-involved oil spill, the *prima facie* elements of strict liability under OPA are proof that (i) a vessel (ii) "owned" or "operated" by a "responsible party" (iii) discharged oil (or posed the substantial threat of a discharge of oil) into or upon the navigable waters or adjoining shorelines or the exclusive economic zone (the EEZ extends 200 miles seaward).  OPA, 33 U.S.C. § 2702(a).

Defendant Regal Stone has admitted that at all relevant times it was the owner of the COSCO BUSAN and that it is a "responsible party".  [Amended Answer, Docket No. 163, ¶¶ 8, 14.]  Regal Stone has further admitted that the allision with the Bay Bridge ruptured two of the COSCO BUSAN's fuel tanks and caused a portion of the vessel's fuel oil to be discharged into navigable waters of the United States and onto adjoining shorelines.  In their recent Amended Complaint filed in the related case styled *Regal Stone Limited and Fleet Management, Ltd. v. Cota, The San Francisco Bar Pilots Association, et al.*, C08-5098 SC (N.D. Cal.), Regal Stone affirmatively alleged, "Approximately 53,000 gallons of bunker fuel (oil) escaped from one of [the vessel's tanks] into San Francisco Bay ("Incident")."  [*Id.*, Docket No, 35, ¶ 17.]

As explained above, OPA also casts strict liability on an "operator" of a vessel.  Apparently trying to evade liability as an OPA "operator", Fleet argues that it merely is a "technical manager".  It is a self-made distinction without a difference for purposes of OPA liability, particularly in view of Fleet's admissions in its Criminal Case, and not least its express admission regarding its status as the "Company" within the meaning of the International Safety Management Code ("ISM Code").

In the "Joint Factual Statement" made a part of its "Plea Agreement" in the Criminal Case, Fleet made the following admissions (emphasis added):

> ... Fleet Management Limited (Hong Kong) (also known as 'FML' and 'Fleet Management Ltd.') (hereinafter 'Fleet'), by and through its undersigned authorized corporate officer and criminal defense counsel, hereby agree that the following is an accurate and sufficient factual statement in support of the attached plea agreement signed this date.  In pleading guilty to the following criminal charges set forth in the Third Superseding Indictment, Fleet acknowledges that it is liable for the acts and omissions of its agents and employees acting within the course and scope of their agency and/or employment.
>
>     *          *          *          *          *          *
>
>     At all times relevant to the charged conduct, defendant Fleet was headquartered in Hong Kong, and by the through its employees and agents and related

entities, managed ships, including the *M/V Cosco Busan* ('*Cosco Busan*'). *Ship records for the Cosco Busan, including the Document of Compliance, Interim Safety Management Certificate, and Continuous Synopsis Record list defendant Fleet as the 'Company' responsible for managing the Cosco Busan including the duties and responsibilities imposed by the International Management Code for the Safe Operation of Ships and for Pollution Prevention, also known as the International Safety Management ('ISM') Code.* Fleet Management Europe Ltd. ('FMEL'), a sister corporation of the defendant, was also involved in the management of the Cosco Busan.

II.    <u>Clean Water Act/Oil Pollution Act of 1990</u>

In pleading guilty to Count 1 [negligence under the Clean Water Act, as amended by OPA], defendant Fleet acknowledges that it was a cause of a discharge of a harmful quantity of oil into the navigable waters of the United States, that it acted negligently, and that its negligence was a proximate cause of the discharge of oil into San Francisco Bay on November 7, 2007.

\*            \*            \*            \*            \*            \*

On or about October 24, 2007, defendant Fleet assumed responsibility for the first time for managing the *Cosco Busan*. On that day, Fleet installed a new crew on the vessel. The crew was recruited, vetted and appointed by a manning agency selected by Fleet. ... Fleet did not provide the crew with additional training regarding bridge procedures, bridge team management, the ship's Electronic Charting System or voyage passage planning prior to the ship's departure from Pusan on October 25, 2007.

In September 2007, Fleet placed a deck Superintendent and a Chief Engineer onboard the *Cosco Busan* in advance of taking over management of the ship. ...

\*            \*            \*            \*            \*            \*

A Safety Management System (SMS) is required under the ISM Code. The ISM Code is an international standard required by the Safety of Life at Sea ('SOLAS') Convention, a treaty to which most maritime nations, including Hong Kong, Korea, and the United States, are parties.

While many SMSs have similar information since they are designed to meet the same ISM standards, Fleet had an independent obligation to effectively implement an approved SMS and to ensure that the crew was familiar with Fleet's SMS. As set forth below, the crew deviated significantly from certain aspects of Fleet's SMS.

[*United States v. Fleet Management Limited, John Cota, supra*, No. 08-CR-00160 SI, Docket No. 328, August 13, 2009, "Joint Factual Statement", pp. 2-3, attached to counsel's Declaration herein as Exhibit "A".] Fleet further admitted the fact of its operation with respect to post-spill actions that culminated in Fleet's plea and felony conviction for Obstruction of Justice and False Statements:

II.    <u>Obstruction of Justice and False Statements</u>

Immediately following the allision, the United States Coast Guard, acting within its jurisdiction, initiated a casualty investigation into the allision and discharge of oil. The Coast Guard and State of California authorities were present on the vessel shortly after the allision on November 7, 2007, and a State of California inspector saw that there was a passage plan on the vessel. The Coast Guard did not on that occasion review or ask to review the passage plan, but did ask to review the official navigational chart which they photographed showing four 'fixes' documenting the

location and time of a ship's position during the voyage.

After the allision, between November 7, 2007, and December 7, 2007 (when the crew disembarked), Fleet, acting through its agents and employees, concealed ship records and created materially false, fictitious and forged documents with an intent to influence the Coast Guard's investigation.  In particular, multiple berth-to-berth passage plans for the three voyages of the *Cosco Busan*, including the day of the allision, were created after the incident.

The fact that the false passage plans were created after the allision was not disclosed by Fleet or the crew prior to May 2008.  Similarly, Fleet did not produce the original passage plans or reveal their existence prior to May 2008 to the grand jury, the Coast Guard or to other investigators.[5]/

[*Id.,* "Joint Factual Statement", pp. 6-7.]  Approximately one month before the allision, Regal Stone and Fleet's parent and/or affiliate, Fleet Ship Management, Inc., executed a standard industry contract for operation of the COSCO BUSAN.  The contract, commonly referred to as "SHIPMAN 98", provided for management and day-to-day operation of the vessel.  Regal Stone further agreed per the executed contract (at paragraph 10) that Fleet Ship Management, Inc., could subcontract any of its obligations to Fleet Management Limited, the defendant herein.[6]/

In fact, Fleet Ship Management did subcontract to (defendant) Fleet, as evidenced by Regal Stone's formal letter/communication to the Government of Hong Kong in October 2007.  The letter states in relevant part, "[T]he Company *operating* the vessel within the meaning of Section 3.1 of the International Safety Management Code is [defendant] Fleet Management Limited ..." [Underhill Declaration, Exhibit "C", emphasis and bracketed word added.]  Regal Stone's letter to the Government of Hong Kong was not gratuitous, but instead was required by the ISM Code, which mandates at Paragraph 3.1 (titled "Company Responsibilities and Authority"), "If the entity who is responsible for the *operation* of the ship is other than the owner, the owner must report the full name and details of such entity to the Administration."  (Emphasis added.)  (Since COSCO BUSAN was flagged in Hong Kong, "Administration" refers to the Government of Hong Kong.)

"The purpose of this Code is to provide an international standard for the safe management and operation of ships and for pollution prevention."  (Quoting from the Preamble of the ISM Code.)  The

---

[5]     The falsified documents were provided to the United States as part of Fleet's Rule 26 Initial Disclosures in this case.  The falsified documents thereafter were used unknowingly by Government and various private party counsel in civil depositions of COSCO BUSAN crewmembers.

[6]     The "SHIPMAN 98" contract is attached as Exhibit "B" to the Underhill Declaration.

ISM Code section specifically referred to in Regal Stone's letter defines "Company" as meaning "the owner of the ship or any other organization or person such as the manager ... who has assumed the responsibility for *operation* of the ship from the shipowner and who, on assuming such responsibility, has agreed to take over all duties and responsibility imposed by the Code." (Emphasis added.)[7]/ Furthermore, Clause 4.2 of the SHIPMAN 98 contract itself states in relevant part (emphasis added):

4.1   The Managers undertake to use their best endeavors to provide the agreed Management Services as *agents* for and on behalf of the Owners in accordance with sound ship management practice and to protect and promote the interests of the Owners in all matters relating to the provision of services hereunder. ...

       *          *          *          *          *

4.2   Where the Managers are providing Technical Management in accordance with sub-clause 3.2, they shall procure that the requirements of the law of the flag of the Vessel are satisfied and they shall in particular be deemed to the "Company" as defined by the ISM Code, *assuming the responsibility for the operation of the Vessel* and taking over the duties and responsibilities imposed by the ISM Code when applicable.

Finally, we note that Fleet actually *advertises* its role as a vessel operator, stating on its public website (emphasis added):

*The primary function of Fleet Management is to provide ship owners with safe ship operation and pollution prevention services*, at the same time, ensuring optimum cost effective performance. A great deal of emphasis is given to ship board maintenance by fully qualified and efficient crew. To achieve this we have a well trained crew on board, qualified under STCW Convention, backed up by very experienced and professional shore based staff.[8]/

Based upon the foregoing, OPA's *prima facie* liability elements have been established as to Regal Stone (as vessel owner) and Fleet (as vessel operator).

## 2.   NMSA Strict Liability Elements

Under the NMSA the *prima facie* elements of strict liability attach when (i) "any person" (ii) destroys, *causes the loss of, or injures* (iii) *any* sanctuary resource. 16 U.S.C. § 1443(a)(1). (Emphasis added.) With respect to *in rem* liability, liability attaches to "any vessel" that is used to "destroy, cause the loss of, or injure *any* sanctuary resource ..." 16 U.S.C. § 1443(a)(2). (Emphasis added.)

//

---

[7]      ISM Code, < http://www.imo.org/humanelement/mainframe.asp?topic_id=287 >.

[8]      Underhill Declaration, Exhibit "D" at pages 2, 3.

Mindful of the fundamental requirement that words in a statute must be given their ordinary or natural meaning, *Ardestani v. I.N.S.*, 502 U.S. 129, 135-36, 112 S.Ct. 515, 520, 116 L.Ed.2d 496 (1991), *United States v. Miguel*, 111 F.3d 666, 670 (9th Cir. 1997), *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 164, 105 S.Ct. 638, 645, 83 L.Ed.2d 556  (1985), the word "any" is a clear word of broad inclusion meaning, "one or more indiscriminately from all those of a kind; any person or persons; ... any thing or things; any part, quantity or number..." Webster's Third New International Dictionary of the English Language Unabridged. (1976).

The NMSA expressly defines "persons" as not only including "individuals", but also corporate and other legal entities. 15 C.F.R. § 922.3.  Moreover, the Dictionary Act, 1 U.S.C. § 1, establishes the statutory guidelines for interpretation of Congressional acts and provides:

> In determining the meaning of any Act of Congress, unless the context indicates otherwise -
>
> *          *          *          *          *          *
>
> the words 'person' and 'whoever' include corporations, companies, associations, firms,  partnerships, societies, and joint stock companies, as well as individuals ....

The same rule applies through operation of case law.  As held in *United States v. Bly*, 510 F.3d 453, 461 (4th Cir. 2007):

> Moreover, under ordinary usage, the term 'person' is defined as 'a human being, a body of persons, or a corporation, partnership, or other legal entity that is recognized by law as the subject of rights and duties.' *Webster's Dictionary,* 1686 (3d ed. 2002) (emphasis added). Thus, a plain meaning assessment of § 876(b) compels us to conclude that the term 'person,' as used in the Extortion Element, is not limited to living and breathing persons. [Footnote omitted.]  The Supreme Court has strongly buttressed this conclusion by its recognition in *Monell v. Dep't of Social Serv. of City of New York,* 436 U.S. 658, 687, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), that 'it is well understood that corporations should be treated as natural persons for virtually all purposes of constitutional and statutory analysis.'

Nothing in the context of the statute indicates that corporate entities are excluded from the scope of liability – indeed, the regulations implementing the NMSA specifically include them.  *See also, Great Lakes Dredge & Dock Co., supra*, 259 F.3d at 1304-05 (applying the NMSA to corporate entities); *United States v. M/V Miss Beholden*, 856 F.Supp. 668 (S.D. Fla. 1994) (applying the NMSA to corporate entities, individuals, and vessel).

As outlined above in the previous section, Fleet has admitted that "it was a cause of a discharge of a harmful quantity of oil into the navigable waters of the United States, that it acted negligently, and that its negligence was a proximate cause of the discharge of oil ..." ["Joint Factual

Statement", *supra*, pp. 2-3.]²/

With respect to Cota, he too admitted culpability in the plea entered in the Criminal Case. Specifically, in pleading to negligence under the Clean Water Act, 33 U.S.C. §§ 1319(c)(1)(A) and (b)(3), as well as pleading to violations of the Migratory Bird Treaty Act, 16 U.S.C. §§ 703 and 707(a), Cota admitted:

> In pleading guilty to the aforementioned offenses, based on the foregoing, I acknowledge that my negligence was a proximate cause of the discharge of the approximately 53,000 gallons of heavy oil fuel into the San Francisco Bay. I further acknowledge the oil spill caused the death of protected migratory birds, including Brown Pelicans, Marbled Murrelets, and Western Grebes and that I did not have a permit or authority to discharge oil into the San Francisco Bay or to take migratory birds.

[*United States v. Fleet Management Limited, John Cota, supra*, No. 08-CR-00160 SI, Docket No. 245, March 6, 2009, "Plea Agreement", p. 4, attached to counsel's Declaration as Exhibit "E".]

Finally, the COSCO BUSAN spill destroyed, caused the loss of, and/or injured sanctuary resources within the Gulf of the Farallones National Marine Sanctuary and the Monterey Bay National Marine Sanctuary. The boundaries of the two Sanctuaries are established by regulation. 15 C.F.R. § 922.80 (Gulf of the Farallones Sanctuary) and 15 C.F.R. § 922.130 (Monterey Bay Sanctuary). The two Sanctuaries abut each other and together encompass nearly 5,000 square nautical miles of coastal and ocean waters. For purposes of this motion, it is sufficient to understand that the two Sanctuaries in combination extend from approximately Bodega Bay on the north, down nearly to the Golden Gate, and from the southern ocean shores of San Francisco south to Monterey and beyond, and extend generally within those boundaries from the mean high water line ashore to their seaward boundaries many miles offshore. [*See*, the Map attached as Exhibit "A" to the Declaration of Maria C. Brown.]

"Sanctuary resource" is broadly defined in the NMSA as "any living or nonliving resource of a national marine sanctuary that contributes to the conservation, recreational, ecological, historical, educational, cultural, archeological, scientific, or aesthetic value of the sanctuary ..." 16 U.S.C. §

---

[9]    Solely for purposes of *this* Motion the United States does not include defendant and vessel owner Regal Stone within the scope of seeking to establish the *prima facie* elements of liability under the NMSA and the PSRPA, the latter discussed *infra*. After completion of sufficient discovery, the United States may file a motion that addresses Regal Stone's liability under the two statutes.

1432(8).[10]/ With respect to "injure", the term is very broadly defined in 15 C.F.R. § 922.3 as meaning "to change adversely, either in the short or long term, a chemical, biological or physical attribute of, or the viability of.  This includes, but is not limited to, to cause the loss of or destroy."

"Damages" statutorily is defined in the NMSA, 16 U.S.C. § 1432(6), as including compensation for (emphasis added):

> (i)(I) the cost of replacing, restoring, or acquiring the equivalent of a sanctuary resource; and
>
> (II) *the value of the lost use of a sanctuary resource pending its restoration or replacement* or the acquisition of an equivalent sanctuary resource; ...
> *         *         *         *         *         *         *
> (ii) the value of a sanctuary resource if the sanctuary resource cannot be restored or replaced or if the equivalent of such resource cannot be acquired;
>
> (B) the cost of damage assessments under section 1443(b)(2) of this title;
>
> (C) the reasonable cost of monitoring appropriate to the injured, restored, or replaced resources; ...

While Fleet and Cota presently may dispute the full extent and dollar value of the United States' damages and the injuries to sanctuary resources, we hope and expect that neither they nor their attorneys, as officers of the Court, would seriously or credibly attempt to argue that sanctuary resources were not either "destroyed, lost, or injured."  In any event, for the purposes of this summary judgment motion the United States provides the Declaration of Maria C. Brown, which minimally sets out the very *basic* outlines of some of the injuries to Sanctuary resources.  We emphasize that for purposes of this motion the United States purposely has *not* attempted to put a dollar value on the injuries *or* to describe the full extent of injuries, types of injuries, and damages.  Instead, the United States simply has demonstrated minimal *examples* of damages and non-negligible injuries to sanctuary resources that are relevant to establishing the *prima facie* elements of NMSA liability.

Merely as an *example* of injuries to sanctuary resources, the spill of toxic bunker oil caused the total closure of certain beaches and shorelines within the two Sanctuaries for more than 120 lost

---

[10]    "Sanctuary resource" is further defined at 15 C.F.R. § 922.3 as comprising "any living or non-living resource of a National Marine Sanctuary that contributes to the conservation, recreational, ecological, historical, research, educational, or aesthetic value of the Sanctuary, including, but not limited to, the substratum of the area of the Sanctuary, other submerged features and the surrounding seabed, carbonate rock, corals and other bottom formations, coralline algae and other marine plants and algae, marine invertebrates, brine-seep biota, phytoplankton, zooplankton, fish, seabirds, sea turtles and other marine reptiles, marine mammals and historical resources. ..."

use days by the public.[11]/  These closures prevented literally tens of thousands of the public from engaging in *any* activities on the affected shorelines, including swimming, surfing, boating, kayaking, sail boarding, and even the simple act of walking along the beach.  Moreover, on days when the shorelines were not closed to all public use as a result of the spill, there were approximately 200 additional lost use days when public use was limited for the protection of public health, such as restrictions that forbid fishing.  [Declaration of Maria C. Brown; Declaration of Patricia L. Neubacher, Exhibit "B", the FRE Rule 1006 Summary of Beach Closures, which is based upon data that were compiled with the assistance of, among others, representatives of Regal Stone.]

These "lost use" injuries (*i.e.*, the public's loss of use of public resources held in trust by federal Natural Resource Trustees) are compensable under the NMSA pursuant to 16 U.S.C. § 1432(6)(II), *id.*. *See also*, *e.g.*, *Alaska Sport Fishing Association v. Exxon Corporation*, 34 F.3d 769 (9th Cir. 1994) (class action by private fishermen against Exxon for loss of public use of natural resources following the Exxon Valdez oil spill; since damages for loss of use of public resources were natural resource injuries sued upon and settled by the United States and the State of Alaska as trustees on behalf of the public, suit by the private party class plaintiffs was precluded). *See also*, 15 C.F.R. § 990.30 ("Injury may occur directly or indirectly to a natural resource and/or service.  Injury incorporates the terms 'destruction,' 'loss,' *and 'loss of use'* as provided in OPA.") (Emphasis added.)[12]/

As another *example* of injuries to sanctuary resources, Governor Schwarzenegger signed "Executive Order S-14-07" on November 14, 2007, which resulted in the closure of all commercial and recreational fishing in San Francisco Bay and surrounding areas.  This closure remained in effect until November 29, 2007, and covered an area outside the Bay extending out to three nautical miles offshore and from San Pedro Point in San Mateo County north to the Point Reyes Lighthouse.  [The

---

[11]    Each separate beach or shoreline is considered an individual closure day.  For example, North Rodeo Beach was closed to all public use for thirty-two days (the shoreline of Rodeo Beach below the mean high water line is within the Monterey Bay Sanctuary) and Stinson Beach was closed for thirteen days (the shoreline of Stinson Beach below the MHWL is within the Gulf of the Farallones Sanctuary).  The total of the complete loss of public use days for those two Sanctuary shorelines and their appurtenant waters therefore is forty-five.

[12]    OPA defines natural resource damages as including, "Damages for ... loss of, or loss of use of, natural resources, ... which shall be recoverable by a United States trustee ..." 33 U.S.C. § 2702(2)(A).

Executive Order and map showing the areas of closure are attached as Exhibits "B-1" and "B-2" to the Declaration of Maria. C. Brown.]  Much of the no-fishing zone outside the Bay was located within the boundaries of National Marine Sanctuaries.  Accordingly, for an additional 15 days the public lost the use of Sanctuary resources (*e.g.,* the opportunity for non-commercial fishermen to fish within Sanctuary waters) not only from the shore, but up to three nautical miles offshore as well.[13]/

As yet another *example* of injuries relevant to the *prima facie* elements of liability, during the response to the COSCO BUSAN spill literally thousands of birds from over 50 species were collected live and dead.[14]/  Of the over 1,000 injured birds collected alive, over 400 were cleaned and eventually released back into the water.  Over 1,800 birds were killed, including seabirds such as Brown Pelicans and Marbled Murrelets, both of which are protected under the federal and state Endangered Species Acts.  *See*, 16 U.S.C. §§ 1531, *et seq.*, and Cal.Fish & G.Code §§ 2050, *et seq.*[15]/ Likewise, large numbers of birds protected under the Migratory Bird Treaty Act, 16 U.S.C. §§ 703, *et seq.*, were injured and killed.  *(Cf.*, Cota's criminal plea to the MBTA; "Plea Agreement", *supra*, p. 4.)

The summaries of birds killed or injured as a result of the spill are attached to the Declaration of Carolyn M. Marn as Exhibit "B" (FRE Rule 1006 Summary of "Dead Birds") and Exhibit "C" (FRE Rule 1006 Summary of "Live Birds"), and provide detailed summaries of the types and numbers of birds affected by the spill.  We reiterate that this motion does *not* seek to establish an

---

[13]      Various suits have been filed against Regal Stone and Fleet by commercial fishermen who claim damages due the spill and fishery closures.  For purposes of this example of the loss of use of Sanctuary resources due to the State of California's fisheries closures, we shall limit the example to non-commercial sport and recreational fishermen.

[14]      The bird species include Brown Pelican, Marbled Murrelet, Ancient Murrelet, Cassin's Auklet, Rhinoceros Auklet, various types of Grebes, Common Murre, various types of ducks, Pigeon Guillemot, Geese, Herons, various types of Gulls, American Coot, Western Sandpiper, Red-shouldered Hawk, Parasitic Jaeger, various types of Cormorant, *etc.*  The species are listed on Exhibits "B" and "C" to the Declaration of Carolyn M. Marn.

[15]      Brown Pelicans are an endangered species under the federal Endangered Species Act and fully protected under the California ESA.  Eight Brown Pelicans were found already dead and four found alive, but injured.  Marbled Murrelets are a threatened species under the federal ESA and an endangered species under the State statute; two were found dead.  The federal ESA establishes a $25,000 civil penalty for each violation of the Act.  16 U.S.C. § 1540.  The State ESA provides for a civil penalty of $5,000 for each violation.  Cal.Fish & G.Code § 120008.

amount of monetary damages for injured birds, or even any exact number of birds that were injured or killed as a result of the spill -- instead, Exhibits "B" and "C" are submitted merely to demonstrate the *prima facie* statutory element of "injury" to "any" sanctuary resources.

### 3.   PSRPA Strict Liability Elements

The elements of strict liability under the PSRPA are nearly identical as those under the NMSA. Accordingly, under the PSRPA the *prima facie* elements of strict liability attach when (i) "any person" (ii) destroys, *causes the loss of, or injures* (iii) *any* park system resource. 16 U.S.C. § 19jj-1(a). (Emphasis added.) With respect to *in rem* liability, it attaches to "Any instrumentality, including but not limited to a vessel ... that destroys, causes the loss of, or injures any park system resource or any marine or aquatic park resource ..." 16 U.S.C. § 19jj-1(b). (Emphasis added.)

We do not intend to reiterate the same analysis and law set out above in the discussion of the NMSA. To sum up, the plain meaning of the word "any" in the PSRPA means just that – any. The word "persons" includes individuals and corporate entities. 1 U.S.C. § 1; *United States v. Bly, supra,* 510 F.3d at 461. Finally, nothing in the context of the PSRPA indicates that corporate entities are excluded from the scope of liability. *Cf., Tug Allie-B, Inc. v. United States, supra,* 273 F.3d 936, 942-43, fn.5 (applying the PSRPA to the corporate owner and corporate operator of a vessel; also stating that the *in personam* liability provision of the PSRPA are substantially the same as that of the National Marine Sanctuaries Act). In that context, both Fleet (a corporate entity) and Cota (an individual) have admitted that their respective actions were proximate causes of the discharge of approximately 53,000 gallons of fuel oil from the ship into San Francisco Bay. [Fleet's "Joint Factual Statement" in the Criminal Case, *supra*; Cota's "Plea Agreement", *supra*.]

Similar to the NMSA, "damages" statutorily is defined in the PSRPA, 16 U.S.C. § 19jj(b), as including compensation for (emphasis added):

> (A)(i) the cost of replacing, restoring, or acquiring the equivalent of a park system resource; and

> (ii) *the value of any significant loss of use of a park system resource pending its restoration or replacement or the acquisition of an equivalent resource*; or

> (B) the value of the park system resource in the event the resource cannot be replaced or restored.

> (2) The cost of damage assessments under section 19jj-2(b) of this title.

//

The COSCO BUSAN spill destroyed, caused the loss of, and/or injured park system resources inside and outside of San Francisco Bay, *e.g.*, the Golden Gate National Recreation Area, which includes the heavily oiled Alcatraz Island, as well as Muir Beach, Stinson Beach, Baker Beach, China Beach, Fort Funston, Fort Mason, Fort Point National Historic Site, Lands End, Ocean Beach, Tennessee Beach, Rodeo Beach, the San Francisco Maritime National Historic Park (*e.g.*, the "Hyde Street Pier" near Aquatic Park and historic vessels moored there), and the Point Reyes National Seashore. The injuries, which were the subject of widespread public news coverage, included, but were not limited to, oiled beaches, oiled vessels in the Maritime National Historic Park, and undisputed closures of beaches at national parks that prevented the public from using park system resources. As examples, the total closures at all affected national parks exceeded 500 public lost use days. Even on days when national parks in the Bay Area were not closed to all public use as a result of the spill, there were approximately 250 additional "park days" when use was limited, such as restrictions that precluded fishing.[16]/ [*See*, Declaration of Patricia L. Neubacher, Exhibit "B".]

With respect to injuries to park system resources such as birds, birds inside and outside San Francisco Bay were killed and injured as a result of the spill. *See*, Exhibits "B" and "C" to the Marn Declaration. As the exhibits show, many birds were found within the Point Reyes National Seashore, much of which is a congressionally designated wilderness area included within the Seashore's 20,000 acres of coastal and estuarine waters. Point Reyes is the center of one of only five coastal eastern boundary upwelling ecosystems in the world and the only one in North America. The geology of the peninsula and its association with the Pacific Ocean have created unique estuarine environments that are some of the most unspoiled in the United States, including Drake's Estero, Estero de Limantour, and Abbott's Lagoon, with Drake's Estero having been characterized as possibly the most pristine estuary on the Pacific Coast. The estero is used by numerous bird species, some of which are either state or federally listed. Point Reyes Headland and several large nearshore rocky islands along the

---

[16]     Since the shoreward boundaries of the Gulf of the Farallones and Monterey Bay National Marine Sanctuaries generally extend up to the mean high tide line, they overlap in some cases with geographical limits of park system resources (such as beaches) that are included within the scope of the PSRPA. An injured resource therefore can be subject both to the NMSA and the PSRPA, or even OPA. As the Court noted in its previous Order denying Fleet's and Regal Stone's motion to dismiss, this does not prevent overlapping statutory coverage and liability, but merely precludes double recovery. *United States v. COSCO BUSAN, et al., supra,* 557 F.Supp.2d at 1063.

peninsula support several thousand nesting and roosting seabirds, particularly large colonies of Common Murre, cormorants, Ashy Storm-petrels, and Brown Pelicans.

Similarly, many birds were found within the authorized boundaries of the Golden Gate National Recreation Area, which comprises approximately 75,000 acres of coastal lands including the mouth of San Francisco Bay.  Its legislative boundary encompasses the Marin Headlands north of and the ocean shoreline south of the Golden Gate, Alcatraz Island, and Angel Island.  Alcatraz itself supports several species of nesting and roosting seabirds and waterbirds, including Brown Pelicans.

As with the NMSA, the defendants may argue about the full extent and dollar value of the injuries to park system resources.  They cannot, however, credibly assert that park system resources were not "destroyed, lost," or, at the very least, "injured."  The United States nevertheless provides the Neubacher and Marn Declarations, which set out the *basic* outlines of some of the injuries to park system resources.  Also as per our discussion of the NMSA above, the United States *purposely* has *not* attempted to put a dollar value on injuries for purposes of this motion, but instead merely has demonstrated that injuries to park system resources occurred, thereby establishing the *prima facie* elements of statutory liability under the PSRPA.

### III.   DEFENDANTS CANNOT SUSTAIN THEIR BURDEN OF PROVING THE STATUTORY DEFENSES TO STRICT LIABILITY UNDER OPA, THE NMSA, AND THE PSRPA

The United States has established the elements of strict liability under OPA, NMSA, and the PSRPA.  With few exceptions, discussed below, each of the statutes contain nearly identical exceptions to this strict liability.  To begin with, each of the statutes expressly place the burden of proving a defense to strict liability *upon the defendant*.  OPA, 33 U.S.C. § 2703(a) ("A responsible party is not liable ... if the responsible party establishes, by a preponderance of the evidence ...");  NMSA, 16 U.S.C. § 1443(a)(3) ("A person is not liable under this subsection if that person establishes that ....");  and PSRPA, 16 U.S.C. § 19jj-1(c) (" A person is not liable under this section if such person can establish that...").  *See also*, *Unocal Corporation v. Metrolink, supra*, 222 F.3d at 534-35 (OPA); *Tug Allie-B, Inc. v. United States, supra*, 273 F.3d 936 (PSRPA); *Great Lakes Dredge & Dock Co, supra*, 259 F.3d at 1306-07 (NMSA).  With one limited exception discussed below concerning OPA, none of the defenses to liability are applicable to this case.  We discuss each statute in turn.

**A.    Defenses to OPA Strict Liability**

Section 2703 of OPA enumerates the statute's extremely limited defenses.  To establish a defense, Regal Stone and Fleet must prove that the discharge was caused: (1) *solely* by act of God, (2) *solely* by act of war, (3) *solely* by the act or omission of a third party, or *solely* by a combination of one or more of the foregoing three defenses.  OPA, 33 U.S.C. § 2703(a).  The act of God and act of war defenses are obviously inapplicable.  The "sole fault third party" defense under 33 U.S.C. § 2703(a)(3) is extremely narrow.  It applies to (emphasis added):

> ... an act or omission of a third party, *other than an employee or agent of the responsible party or a third party whose act or omission occurs in connection with any contractual relationship with the responsible party* ... if the responsible party establishes, by a preponderance of the evidence, that the responsible party–
>
> (A) exercised due care with respect to the oil concerned, taking into consideration the characteristics of the oil and in light of all relevant facts and circumstances; and
>
> (B) *took precautions against foreseeable acts or omissions of any such third party and the foreseeable consequences of those acts or omissions*; ...

Should Regal Stone and Fleet argue that Cota is a third-party, we note the well-settled rule that the "third party" defense is narrowly construed to encompass only actions *entirely* outside the ship and that compulsory pilots, like Cota, are not deemed "third parties" within the statutory meaning of the exception.  *See, e.g., Burgess v. M/V TAMANO*, 564 F.2d 964 (1st Cir. 1977), *cert. denied*, 435 U.S. 941 (1978) (decided under the FWPCA/CWA). Even were that not the case, the Master of the vessel executed a document that, in and of itself, established a contractual relationship within the broad meaning of OPA.  [Underhill Declaration, Exhibit "F".]  *See, e.g., International Marine Carriers v. Oil Spill Liability Trust Fund*, 914 F.Supp. 149, 151-52 (S.D. Tex. 1995), discussing the extreme breadth of the term "any contractual relationship" within the context of OPA.

Fleet has admitted in its criminal plea that it was a proximate cause of the spill, negating at the outset its invocation of the sole fault third-party defense.  Likewise, Regal Stone is unable to sustain its burden of establishing the defense.  Wholly aside from the fact that a pilot like Cota is not deemed a "third party", *Burgess v. M/V TAMANO, id.*, both Cota *and* Fleet admitted in their relevant plea agreements that they proximately caused the spill.  Regardless of whether Fleet is characterized as the COSCO BUSAN's "technical manager" or its "operator" (and indeed, there is no difference between the two), Fleet was Regal Stone's "agent", as specifically set out in Paragraph 4.1 of the SHIPMAN 98" contract executed by Regal Stone.  Finally, Fleet also is an entity "whose act or

omission occur[red] in connection with *any* contractual relationship with the responsible party ..." OPA, 33 U.S.C. § 2703(a)(3) (emphasis added).  [*See*, *e.g.*, Underhill Declaration, Exhibit "B", the SHIPMAN 98 contract; and Exhibit "C", Regal Stone's letter to the Hong Kong Government.]

For the reasons set forth above, and especially in view of the admissions made by Cota and Fleet, neither Regal Stone nor Fleet can sustain their burden of proving by a preponderance of the evidence that the spill was *solely* caused by "an act of God", an "act of war", or a "third-party", as such latter term is defined in OPA.

In addition to the foregoing complete defenses, OPA provides a partial defense to liability pursuant to 33 U.S.C. § 2703(b), which states:

(b) Defenses as to particular claimants

A responsible party is not liable under section 2702 of this title to a claimant, to the extent that the incident is caused by the gross negligence or willful misconduct of the claimant.

Regal Stone and Fleet have pled in their Amended Answer and Counterclaims that the COSCO BUSAN incident was caused by the "gross negligence and willful misconduct" of the United States.  [*See,* Regal Stone's and Fleet's Tenth Affirmative Defense.]  To be blunt, the United States has considered, and still is considering, taking action under Rule 11 and possibly other avenues concerning the allegation – all the more so in view of the conduct admitted to by Fleet in its plea in the Criminal Case.  Nevertheless, assuming *solely* for the sake of argument that the United States even could be considered a "claimant" and thus subject to 33 U.S.C. § 2703(b), *this* motion does not seek judgment on the "gross negligence and willful misconduct" defense, which is reserved for later motion and proceedings, as may be appropriate.[17]/

Instead, this motion, as it pertains to OPA, seeks a declaration that Regal Stone has failed to sustain any and all of its OPA statutory defenses -- *except for the sole argument* that the incident was caused by the "gross negligence or willful misconduct" of the United States.

//

//

---

[17]     For example, the Oil Spill Liability Trust Fund (on whose behalf the United States' Third Cause of Action is asserted) is not defined in OPA as a "claimant", but instead is a separately defined entity.  33 U.S.C. § 2701(11).

**B.    Defenses to NMSA and PSRPA Strict Liability**

Both the NMSA and PSRPA contain essentially the same sole act of God, act of war, and third party defenses as OPA.  *See,* NMSA, 16 U.S.C. § 1443(a)(3), and *Great Lakes Dredge & Dock Co., supra,* 259 F.3d at 1306-07.  Insofar as the PSRPA, *see,* 16 U.S.C. § 19jj-1(c), and *Tug Allie-B, Inc. v. United States, supra,* 273 F.3d at 957.[18]/  As with OPA, the act of God and act of war defenses under the NMSA and PSRPA are irrelevant in the context of the COSCO BUSAN spill.  Likewise, the third party defense is unavailing to Cota, Fleet, and COSCO BUSAN as a matter of law as a result of Cota's and Fleet's admissions of fault in their respective criminal pleas.

The NMSA (but not the PSRPA) contains an additional defense, whereby the *defendant* has the burden of establishing that the "destruction, loss, or injury was negligible."[19]/  As set out above, Fleet and Cota are free to dispute the full extent and dollar value of the injuries to sanctuary resources.  Indeed, for purposes of this motion for summary judgment, the Government does *not* seek to establish the full extent of the injuries and damages.  Nonetheless, for the purposes of this motion the defendants have the burden of establishing that the injury to sanctuary resources is not "negligible".  With respect to the issue and this motion, we have filed the Declaration of Maria C. Brown, which sets out the very *basic* outlines of injuries to the two Sanctuaries concerning merely two *examples* of injuries, *i.e.*, "loss of use" of Sanctuary resources and death and injuries to birds. [*See also,* the Neubacher Declaration, Exhibit "B"; and the Marn Declaration, Exhibits "B" and "C".]

To sum up, the United States has established that Cota, Fleet, and COSCO BUSAN cannot sustain their burden of proving any of the statutory defenses to liability under the NMSA and PSRPA.  Summary judgment on the issue is therefore required as a matter of law.

**IV.    THE DEFENDANTS' STRICT LIABILITY UNDER OPA, THE NMSA, AND THE PSRPA IS NOT LIMITED BY ANY MONETARY CAP**

Strict liability under the NMSA and PSRPA is unlimited by any monetary cap.  *See, e.g.*, NMSA, 16 U.S.C. § 1443(a)(4); *Tug Allie-B, Inc. v. United States, supra*, 273 F.3d 936 (the

---

[18]    The NMSA's and PSRPA's sole act of third party defenses do not include the OPA language regarding parties having "any contractual relationship" with the defendant.

[19]    Both the NMSA and PSRPA also allow a defense in the event the act or contain was caused by "an activity authorized" by Federal or State law.  NMSA, 16 U.S.C. § 1443(a)(3)(C); PSRPA, 16 U.S.C. § 19jj-1(c)(3). The defense is obviously irrelevant with respect to the COSCO BUSAN spill.

Limitation of Liability Act of 1851, now codified at 46 U.S.C. § 30505, does not apply to the PSRPA.  While OPA similarly excludes application of the Limitation of Liability Act, *Complaint of Metlife*, *supra,* 132 F.3d at 821, it allows responsible parties initially to limit liability to an amount based upon the vessel's tonnage.  OPA, 33 U.S.C. § 2704(a).  In the case of the COSCO BUSAN, the responsible parties' tonnage-based OPA limitation is approximately $62 million.

OPA's initial limit on liability can be breached, however, as a result of specific statutory exceptions.  Relevant here is 33 U.S.C. § 2704(c), which provides:

> Subsection (a) of this section [the tonnage-based limitation of liability] does not apply if the incident was proximately caused by
>
> *           *           *           *           *           *
>
> (B) the violation of an applicable Federal safety, construction, or operating regulation by, the responsible party, an agent or employee of the responsible party, or a person acting pursuant to a contractual relationship with the responsible party ...

Based upon the admissions of Fleet in its plea in the Criminal Case, OPA's liability cap was broken as the result of the breach of a federal safety and operating regulation.  The federal "Navigation Safety Regulations" are contained at 33 C.F.R. § 164, *et seq*., and apply to vessels greater than 1600 gross tons (COSCO BUSAN is approximately 62,000 gross tons) and to foreign flag vessels operating in United States waters, as was COSCO BUSAN at the time of the spill.  *See*, 33 C.F.R. § 164.01.

33 C.F.R. § 164.11 is part of the Navigation Safety Regulations and requires in relevant part (emphasis added):

> The owner, master, or person in charge of each vessel underway shall ensure that:
>
> (a) The wheelhouse is constantly manned by persons who:
>
> (1) Direct and control the movement of the vessel; and
>
> (2) *Fix the vessel's position*;
>
> *           *           *           *           *           *
>
> (c) The *position of the vessel at each fix is plotted on a chart of the area and the person directing the movement of the vessel is informed of the vessel's position*; ...

In its "Joint Factual Statement", Fleet admitted as follows (bracketed clause added):

> The Master and crew had an independent duty for the safe navigation of the vessel.  However, once the pilot was on board the *Cosco Busan,* the Master and crew deferred to the pilot who erred in his navigation of the ship.  While the pilot was on board, the crew did not perform certain required tasks, did not take fixes and did not adequately monitor the vessel's progress during the outbound voyage.

\*          \*          \*          \*          \*          \*

No fixes were taken after leaving the berth at 08:07 a.m. on November 7, 2007, and prior to 8:30 a.m. [the allision occurred at approximately 8:30 a.m.]  The Master's Standing Orders required fixes every five (5) minutes in pilotage waters and before and after every change of course.  After the incident, it was determined that the Master and other deck officers were unaware of this requirement.

\*          \*          \*          \*          \*          \*

The Cosco Busan had an official navigational chart on which the ship's position was required to be plotted and recorded.  The chart which came with the ship had a track line drawn by a prior crew as well as fixes from the voyage.  However, after the allision, but before the Coast Guard boarded the *Cosco Busan* later that day and photographed the chart, the Third Officer added fixes on the navigational chart that were not recorded during the voyage.[20]/

[*United States v. Fleet Management Limited, John Cota, supra*, "Joint Factual Statement", pp. 4, 6-7, Exhibit "A" to the Underhill Declaration.]  Whether Fleet is deemed an "agent" or "a person acting pursuant to a contractual relationship" with Regal Stone, Fleet's breach of the foregoing federal Navigation Safety Regulation results in the evisceration of OPA's tonnage-based monetary cap with respect to both defendants/responsible parties.  We further note that any number of violations of safety and operating regulations were breached by those responsible for the COSCO BUSAN, and not least the requirements of various Inland Navigation Rules ("The Rules of the Road"), 33 U.S.C. § 2001, *et seq.*[21]/  However, in view of Fleet's foregoing admissions and the breach of 33 C.F.R. § 164.11, the United States is entitled to entry of summary judgment with respect to its request that Regal Stone's and Fleet's strict liability under OPA is not subject to limitation.  Likewise, the liability of Fleet, Cota, and the COSCO BUSAN under the NMSA and PSRPA is not subject to limitation since neither of those two statutes include a limitation cap.

---

[20]     These falsified additions to the "gun-decked" chart were used by the United States and other parties during civil depositions of COSCO BUSAN crewmen.  Fleet's and the crewmen's admissions concerning the chart came to light after the depositions.  The crew uniformly refused to answer any questions, including those directed at the chart and its contents, on the basis of the Fifth Amendment.

[21]     *See, e.g.*, Rule 2 (Responsibility), Rule 5 (Look-out Rule), Rule 6 (Safe Speed Rule), Rule 7 (Risk of Collision), Rule 8 (Action to Avoid Collision), and Rule 19 (Conduct of Vessels in Restricted Visibility), which are codified, respectively, at 33 U.S.C. §§ 2002, 2005, 2006, 2007, 2008, and 2019.  This motion and its focus on the breach of 33 C.F.R. § 164.11's plotting requirement is wholly without prejudice to the Government's right subsequently to demonstrate that other rules, regulations, and standards similarly were violated by Regal Stone, Fleet, Cota, and others.

## CONCLUSION

For the reasons set out above, the United States is entitled to entry of partial summary judgment as follows:

1.     Partial summary judgment should be entered in favor of the United States, whereby it is adjudged that the United States has sustained its proof of the *prima facie* elements of statutory strict liability under OPA against defendants Regal Stone and Fleet for response costs and damages, including natural resource damages; and whereby it is adjudged that the United States has sustained its proof of the *prima facie* elements of statutory strict liability against defendants Fleet Management and Cota, *in personam*, and COSCO BUSAN, *in rem*, for response costs and damages, including natural resource damages, under the NMSA and the PSRPA;

2.     Partial summary judgment should be entered in favor of the United States and against defendants Regal Stone and Fleet, whereby it is adjudged that Regal Stone and Fleet have failed to sustain their burden of proving any of the statutory defenses under OPA, 33 U.S.C. § 2703(a); and whereby it is adjudged that defendants Fleet Management and Cota, *in personam*, and COSCO BUSAN, *in rem*, have failed to sustain their burden of proving any of their statutory defenses under the NMSA and PSRPA.  As stated above, Regal Stone's and Fleet's "gross negligence and willful misconduct" defense under OPA, 33 U.S.C. § 2703(b), is reserved for further proceedings;

3.     Partial summary judgment should be entered in favor of the United States and against all defendants, whereby it is adjudged that the respective defendants' liability to the United States under the foregoing statutory causes of action is unlimited by any monetary cap.

Dated: November 12, 2009.           TONY WEST
                                     Assistant Attorney General

                                     /s/ R. Michael Underhill
                                     R. MICHAEL UNDERHILL
                                     Attorney In Charge, West Coast Office
                                     ERIC KAUFMAN-COHEN, Trial Attorney
                                     Torts Branch, Civil Division, U.S. Department of Justice

                                     JOHN C. CRUDEN
                                     Acting Assistant Attorney General
                                     Environment and Natural Resources Division

                                     /s/ Bradley R. O'Brien
                                     BRADLEY R. O'BRIEN, Senior Attorney
                                     ANN HURLEY, Trial Attorney
                                     Environmental Enforcement Section
                                     United States Department of Justice

                                     Attorneys for Plaintiff United States of America